## AMARILLO LEGACY MEDICAL ACO
## ACO PARTICIPATION AGREEMENT

This **ACO PARTICIPATION AGREEMENT** ("Agreement") is by and between **AMARILLO LEGACY MEDICAL ACO** ("ACO") and **Amarillo Medical Specialists, LLP** ("ACO Participant") and is effective July 1, 2019 ("Effective Date").

### RECITALS

**WHEREAS,** ACO is organized, among other purposes, facilitate coordination and cooperation among providers to improve the quality of care provided to Participants and reduce unnecessary costs;

**WHEREAS,** ACO has entered into an agreement, with the Centers for Medicare & Medicaid Services to participate in the Medicare Shared Savings Program ("MSSP") to provide services to Medicare fee-for-service beneficiaries assigned to ACO;

**WHEREAS,** ACO and ACO Participant intend that ACO pursue commercial health plan network arrangements, including shared savings and shared loss and other financial risk arrangements and population based, performance based, or similar compensation programs and arrangements;

**WHEREAS,** ACO Participant Providers are duly authorized to provide medical services in the State of Texas;

**WHEREAS,** this Agreement allows physicians and other licensed health care providers employed by, or contracted with, the ACO Participant and who bill for items and services furnished to Medicare fee-for-service or other health plan beneficiaries under the billing number assigned to the tax identification number ("TIN") of the ACO Participant (each, a "ACO Participant Provider") to participate in the ACO's network of providers with respect to the MSSP Agreement and similar arrangements with other health plans;

**WHEREAS,** to the extent ACO Participant is currently party to an agreement with ACO to participate in the MSSP, ACO Participant and ACO believe that this Agreement is necessary to address regulatory changes governing such participation agreement, such as those implemented by 42 C.F.R. § 425.116, and intend that this Agreement replace and supersede the previous participation agreement;

**WHEREAS,** ACO Participant wishes for its ACO Participant Providers to provide and arrange for Covered Services to Medicare fee-for-service beneficiaries and, as applicable, beneficiaries of other health plans in accordance with the terms and conditions set forth in this Agreement and the terms and conditions of the MSSP ("MSSP Requirements");

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, the parties agree as follows:

### I. DEFINITIONS

1.1    "ACO Board" means the board of managers of ACO.

1.2    "ACO Participant Providers" means all individual physicians or other health care providers that are employed or contracted by ACO Participant to provide services to ACO Participant patients and whose medical services are billed under ACO Participant's TIN and provider numbers,

1



and mid-level providers. All ACO Participant Providers are identified by name and National Provider Identifier on Attachment B which is hereby incorporated by reference in this agreement; ACO Participant will notify ACO of the addition or removal of ACO Participant Providers and will provide ACO with an updated Attachment B upon request of ACO and said updated Attachment B, upon receipt by ACO, will supersede the Attachment B currently incorporated in the Agreement. ACO Participant must update its enrollment information, including the addition and deletion of ACO Participant Providers, on a timely basis in accordance with Medicare program requirements and to notify ACO of any such changes within thirty (30) days after the change.

1.3    "APM Bonus" means the five (5) percent Alternative Payment Model payment ACO Participant is eligible to receive as a result of its participation in the MSSP.

1.4    "Beneficiary" means, as of the Effective Date: (i) Medicare beneficiaries assigned to the Medicare Shared Savings ACO Program; and (ii) any eligible beneficiary or group member and any eligible dependent of such beneficiary or group member entitled to health care services or included within a Payor shared savings/shared loss, risk, population based, or performance based compensation arrangement according to the terms of and conditions of this Agreement and any Payor Contract.

1.5    "CMS Agreement" means the Medicare Shared Savings Program Accountable Care Organization Program Agreement and the United States Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS").

1.6    "Covered Services" means those medical, surgical and related health care services which ACO Participant and ACO Participating Providers provide to, or arrange for, Beneficiaries pursuant to the MSSP Agreement, any Payor Contract, and this Agreement.

1.7    "In-Network Provider" means a hospital, physician group, physician, allied health professional, facility or other licensed health care provider who has entered into an agreement with ACO to provide health care services to Participants and to participate in Payor risk, population based, performance based, or similar compensation arrangements.

1.8    "Payor" means: (i) a health plan, including an employer benefit plan, fully insured or self-funded benefit plan, trust fund, health maintenance organization, preferred provider or exclusive provider organization, governmental entity or any other organization that provides a health benefit plan to Participants for health care services or that provides or arranges to provide or contracts with a health care provider network; and (ii) as of the Effective Date, CMS as the sponsor of the CMS Medicare Shared Savings ACO Program.

1.9    "Payor Contract" means an agreement between a Payor and ACO that sets forth the provider network shared savings/shared loss, financial risk, population based, performance based, or other compensation arrangement and that establishes the contractual relationship between the Payor and ACO. The term "Payor Contract" includes, as of the Effective Date, the CMS Agreement.

1.10   "Performance Distribution Plan" means the specific Policies and Procedures regarding the requirements ACO Participant and ACO Participant Providers must meet to be eligible to receive financial incentives. Payments to ACO Participant for services of ACO Participant Providers hereunder will be made in in accordance with the Performance Distribution Plan in effect at a given time adopted by the ACO Board.

1.11   "Performance Measures" means those guidelines and or care management requirements set by ACO from time to time.

2

## II. RELATIONSHIP BETWEEN ACO PARTICIPANT AND ACO

2.1     Independent Contractor.  ACO and ACO Participant are independent entities. Nothing in this Agreement may be construed or be deemed to create a relationship of employer and employee, principal and agent, or any relationship other than that of independent entities contracting with each other solely for the purpose of carrying out the terms and conditions of this Agreement.

2.2     Obligations. Neither party has any express or implied right or authority to assume or create any obligation or responsibility on behalf of or in the name of the other party, except as set forth herein.

2.3     Business Associate Relationship. To ensure ACO has sufficient data and information related to patient care to achieve success in the MSSP, ACO Participant agrees that ACO, acting in its capacity as ACO Participant's and Participating Physicians' business associate under the Business Associate Agreement attached hereto as Attachment C, may request and receive clinical and administrative data from CMS and other data sources pertaining to services a Participating Physician provided, or requested, on behalf of a Beneficiary. Such data may be used by ACO to monitor Covered Services provided to Beneficiaries and each Participating Physician's performance in relation to ACO's and CMS's quality and efficiency standards. Each Party to this Agreement shall ensure that it and all personnel maintain confidentiality of all patient records, charts and other Protected Health Information in accordance with HIPAA and other state and federal laws.

## III. ACO PARTICIPANT DUTIES, SERVICES AND RESPONSIBILITIES

3.1     Scope of Services. ACO Participant agrees to provide or cause ACO Participant Providers to provide medical services to Beneficiaries in accordance with generally accepted medical and professional practices and standards prevailing in the community at the time of treatment. ACO Participant further agrees to require ACO Participant Providers to provide medical services in accordance with the policies and requirements of the Payor(s) responsible for payment for the services provided.

3.2     Participation Criteria. ACO Participant agrees that its ACO Participant Providers will meet the standards for participation as determined by the ACO Board. Upon ACO's request, ACO Participant will require its ACO Participant Providers to execute an agreement to participate in the ACO and to comply with all applicable laws and regulations, including but not limited to the regulations at 42 C.F.R. Part 425, federal criminal law, False Claims Act, anti-kickback statute, civil monetary penalties law, and physician self-referral law.

3.3     Representation. ACO Participant represents and warrants that it is legally authorized to provide the services contemplated by this Agreement.

3.4     Professional Requirements. ACO Participant agrees that its ACO Participant Providers will maintain appropriate licenses, and, except as provided for any exclusions or exceptions determined by the ACO Board, will hold appropriate privileges at hospitals in order to provide services to Beneficiaries. Evidence of compliance with these requirements will be submitted to ACO upon request. ACO Participant agrees to notify ACO, in writing, as soon as it acquires knowledge that any ACO Participant Provider experiences: (i) a loss of license, narcotics number, or any hospital privileges; (ii) any disciplinary action that requires National Practitioner Databank reporting; (iii) a criminal indictment of any nature; and/or (iv) a criminal conviction or an adverse civil judgment relating to the ACO Participant Provider's provision of services. ACO Participant will cooperate with ACO's periodic evaluation of individual ACO Participant Provider's professional qualifications, which will include, but not be limited to, the ACO Participant Provider's consenting to the release of information from any hospital regarding status of medical staff privileges. -

3

APPX 0306

3.5    <u>Compliance with Medicare and Medicaid</u>. ACO Participant Providers will meet certification and licensure standards under Medicare and Medicaid and will abide by all requirements set forth under these programs and any rules and regulations promulgated thereunder, as such requirements, rules and regulations may be amended from time to time.

3.6    <u>Compliance with Law</u>. ACO Participant will use its best efforts to assure that ACO Participant Providers comply with relevant federal, state and local laws, statutes, ordinances, orders, and regulations that apply to the terms and conditions of this Agreement, including but not limited to the regulations at 42 C.F.R. Part 425, federal criminal law, False Claims Act, anti-kickback statute, civil monetary penalties law, and physician self-referral law.

3.7    <u>Availability of Services</u>. ACO Participant agrees to provide medical services to those Beneficiaries who select an ACO Participant Provider or are referred to an ACO Participant Provider to the extent that the provision of such services does not conflict with a case load or scheduling policy of ACO Participant or the ACO Participant Provider. In the event that ACO Participant cannot provide health care services to a Participant, either individually or through coverage, ACO Participant will notify ACO. ACO Participant reserves the right to terminate a Beneficiary so long as such termination complies with all legal requirements, Payor Contracts and ACO Participant policies.

3.8    <u>Quality and Utilization</u>. ACO Participant will cooperate with any ACO quality assurance and utilization management programs, policies and procedures as adopted by the ACO Board. All hospital admissions and continued stays, including ancillary services, outpatient services and any other care, treatment or supplies furnished to a Beneficiary will be subject to ACO's utilization management and quality assurance programs. Such procedures and guidelines may be modified by ACO Board from time to time upon written notice, provided that such modifications are lawful and reasonably consistent with the remaining terms of this Agreement. Utilization management and quality assurance services are for the sole purpose of improving the quality of care provided to Participants and in no way remove, affect, or increase any obligation of ACO Participant to render care. Nothing herein will be construed either to preclude ACO Participant from providing services on such terms as ACO Participant and Beneficiary may agree or to be inconsistent with the principle that ACO Participant is responsible for its own services.

3.9    <u>Non-Discrimination</u>. ACO Participant will not discriminate against Beneficiaries because of race, sex, color, marital status, sexual orientation, age, disabilities, religion or national origin.

3.10    <u>Release</u>. ACO and ACO Participant hereby mutually release the other Party, and their respective affiliates, boards of directors, committees, officers, employees or agents from liability and agree to waive all legal claims that it may now or hereafter have against such individuals or entities related to any and all actions taken in good faith to participate in or manage ACO, including but not limited to evaluating the professional qualifications of individual ACO Participant Providers. ACO Participant further releases from liability any individual or entity who may have information bearing on an individual provider's professional qualifications and discloses such information in good faith to ACO in connection with ACO's evaluating the professional qualifications of individual ACO Participant Providers. ACO and ACO Participant further agree that any act, communication, report, recommendation, or disclosure made in connection with evaluating its ACO Participant Providers' professional qualifications will be privileged and confidential and will not be subject to discovery, subpoena or other means of legal compulsion for their release.

3.11    <u>Capacity</u>. ACO Participant will inform ACO promptly of any material changes in ACO Participant's capacity to accept new Payor Contracts or Beneficiaries, and will give ACO thirty (30) days advance written notice of ACO Participant's desire to cease accepting additional new Participants.

4

3.12    Grievance Procedure.  ACO Participant will participate in ACO's grievance procedures and in applicable Payors' grievance hearing and resolution procedures relevant to any ACO Participant Provider.  ACO Participant will make efforts to resolve oral or written complaints at the informal discussion, consultation or conference level and will submit a written record of each complaint and a summary of the outcome to ACO. In the event a complaint is not resolved to the satisfaction of either ACO Participant or Beneficiary, such complaint and accompanying documentation will be submitted on a timely basis to the ACO or, if applicable, peer review committee.  All interested parties will have an opportunity to present their case, either orally or in writing, to an applicable peer review committee, who will make a final decision to resolve the complaint. At the request of ACO Participant, ACO will cause its peer review committee to represent ACO Participant at Payors' grievance hearings to the greatest extent possible. If the grievance procedure results in an action that is required to be reported pursuant to a Payor Contract, ACO shall report such action to the applicable Payor.

3.13    Health Information Exchange.  ACO Participant will enter into a participation agreement with the ACO health information exchange and remain a participant of the ACO health information exchange during the term of this Agreement.  Through the health information exchange, or as otherwise agreed by ACO and ACO Participant, upon termination of this Agreement ACO Participant agrees to furnish to ACO all data necessary to complete ACO annual assessment of ACO's quality of care and to address other relevant matters.

## IV.  PAYOR CONTRACTS

4.1    Shared Savings ACO Program.  As of the Effective Date, ACO Participant will participate through ACO in the Medicare Shared Savings ACO program and other similar programs identified in a Payor Contract.  ACO Participant will, and ACO Participant will require ACO Participant Providers to, comply with the requirements and conditions of:  (i) the Medicare Shared Savings Program (42 CFR Part 425), including, but not limited to, those specified in the CMS Agreement; and (ii) shared savings, quality or similar programs identified in a Payor Contract.   The specific terms setting forth Participant's participation in the CMS Agreement are set forth on Attachment A and additional requirements regarding participation in a shared savings, quality or similar program with another Payor will be identified pursuant to the Payor Contract.

4.2    Additional Payor Contracts.  It is the intent of ACO and ACO Participant that ACO identify and solicit Payor Contract offers on behalf of ACO and ACO Participants including ACO Participant and ACO Participant Providers.  ACO Participant agrees, and grants to ACO during the term of this Agreement the power of attorney, to execute Payor Contracts on behalf of ACO Participant and ACO Participant Providers, subject to the limitations described herein. and ACO Participant further agrees and understands that ACO Participant and ACO Participant Providers will comply with such Payor Contracts executed by ACO as if executed by ACO Participant and ACO Participant Providers.   Prior to executing a Payor Contract, a committee appointed by the Board to review Payor Contracts (the "ACO Contract Committee") shall review the proposed Payor Contract and make a recommendation to the ACO Board. ACO Participant will convey to the ACO Contract Committee the minimum fees and terms ACO Participant is willing to accept. The ACO Contract Committee shall only give the ACO Board a recommendation to execute a Payor Contract if such contract meets or exceeds ACO Participant's minimum fees and terms. The ACO Board shall execute a Payor Contract on behalf of ACO Participant only after a positive recommendation from the ACO Contract Committee. For purposes of clarity, notwithstanding the foregoing, ACO may enter into the CMS Agreement on behalf of ACO Participant and ACO Participant Providers without review and recommendation by the ACO Contract Committee.

5

a.     Fee Information.  ACO may solicit, maintain and disseminate fee information to Payors and to ACO Participant in connection with proposed Payor Contracts in accordance with antitrust laws and policies adopted by the ACO Board.  ACO Participant agrees to provide fee information reasonably requested by ACO.

b.     Review and Analysis of Offers.  If a Payor submits an offer to ACO for a Payor Contract, ACO will summarize the offer.

c.     Notice of Payor Contract Offers.  ACO will transmit to ACO Participant a notice of any offer from a Payor to enter into a Payor Contract in the form of a "Payor Contract Notice" Prior to submitting the offer to the Contract Review Committee.  The Payor Contract Notice will be transmitted via email to ACO Participant.  The Payor Contract Notice will contain the following:

(i)     Payor Contract summary to include the products included under the proposed Payor Contract;

(ii)    Payor Contract fee schedule;

(iii)   Description of shared savings, shared losses, and/or other incentive or risk-based elements of the Payor Contract (and as specifically applicable to ACO Participant) to the best of ACO's ability based on available information from Payor;

(iv)    Summary of material contract language terms

(v)     Definition of attributed patients and description of how and when such determination would be made; and

(vi)    The effective date of the Payor Contract.

4.3     Provider Compensation for Medical Services.  ACO Participant, or each ACO Participating Practitioner, shall be solely responsible for the billing and collection of professional fees for services rendered to Participants, including Beneficiary, in connection with the ACO Participant's and ACO Participant Providers' participation in Payor Contracts, including the MSSP through ACO.  The parties acknowledge and agree, however, that ACO maintains responsibility for distributing amounts received by ACO from a Payor for any risk-sharing, population-based or performance-based financial arrangement, including but not limited to the CMS Medicare Shared Savings ACO Program, in accordance with this Agreement.  Except as specifically provided in this Agreement, ACO has no liability regarding payment for medical services provided by ACO Participant or ACO Participant Providers; ACO Participant and ACO Participant Providers will look solely to Payor for payment for professional fees.

4.4     Provision of Services.  ACO Participant through its ACO Participant Providers will be solely responsible for providing and coordinating all medical services required of ACO Participant under all Payor Contracts.  ACO Participant is responsible for full compliance with the terms of such Payor Contracts, including provisions relating to referring Participants to In-Network providers contracting with such Payors.  ACO will not interfere in ACO Participant's professional relationships with Beneficiaries under Payor Contracts.

## V. PARTICIPANTS' RIGHTS

5.1     No Notice Due.  ACO Participant and ACO reserve the right to amend or terminate this Agreement upon their mutual agreement without the consent of any Payor or Beneficiary.

5.2     Third Party Beneficiary.  ACO Participant and ACO are the only parties to this Agreement.  This Agreement is not a third party beneficiary contract and will not in any respect whatsoever increase the

6

APPX 0309

rights of Beneficiaries or any other third party with respect to ACO or ACO Participant or the duties of ACO or ACO Participant to Beneficiaries or create any rights or remedies on behalf of Beneficiaries against ACO or ACO Participant.

     5.3    <u>Limitation on Obligations</u>. The duties and obligations of ACO Participant will be subject to the following limitation:

     a.    In the event that ACO Participant or ACO Participant Providers do not have proper facilities to treat Beneficiaries or in the event of circumstances beyond ACO Participant's reasonable control such as major disaster, epidemic, war, complete or partial destruction of facilities, disability of a significant number of personnel or significant labor disputes, ACO Participant will provide health care services to Beneficiaries to the extent possible according to ACO Participant's best judgment and the limitations of such facilities and personnel as are then available, but ACO Participant will have no liability or obligation for delay or failure to provide or arrange for such services due to lack of available facilities or personnel in such disaster, epidemic, labor dispute, or other cause beyond the control of ACO Participant.

## VI. RECORD MAINTENANCE, AVAILABILITY, INSPECTION AND AUDIT

     6.1    <u>Maintenance of Records</u>.  ACO Participant will prepare and maintain medical, financial and other records or data with respect to Beneficiaries that ACO Participant typically prepares and maintains on behalf of ACO Participant's patients.  Such records will be maintained in accordance with prudent record keeping procedures as required by applicable Federal and State law.  In the event ACO cannot obtain an appropriate authorization to release all patient records to ACO and Payor for purposes of utilization management, quality assurance and/or claims payment determination, then ACO Participant agrees to cooperate with ACO to obtain such release.

     6.2    <u>Review of Medical Records</u>. Medical records maintained on behalf of Beneficiaries will remain in ACO Participant's or ACO Participant Provider's office and will be made available for review by ACO or Payor pursuant to written authorization of Beneficiaries to the extent permitted by applicable State and Federal law.

     6.3    <u>Billing and Payment Records</u>.  To the extent permitted by applicable State and Federal law and regulations, and pursuant to a Beneficiaries authorization, ACO Participant agrees to permit ACO and Payor to review the billing and payment records related to the provision of health care services to Beneficiaries. ACO and Payor will also be entitled to obtain copies of such records.

     6.4    <u>Copying of Records</u>.  ACO Participant and ACO Participant Providers will be paid reasonable costs related to the copying of any records.

     6.5    <u>Retention and Access to Books, Documents, and Records</u>.  ACO Participant and ACO Participant Providers will retain the financial and medical records of each Beneficiary for the period of time required by law. ACO Participant further agrees that until the expiration of four (4) years after ACO Participant furnishes the services provided for under this Agreement, ACO Participant will make available to the Secretary of the United States Department of Health and Human Services (the "Secretary") and the United States Comptroller General, and their duly authorized representatives, this Agreement, and all books, documents, and records necessary to certify the nature and extent of the costs of those services for any health benefits program for which the United States government is a party.   If ACO Participant carries out the duties of this Agreement through a subcontract worth Ten Thousand Dollars ($10,000) or more over a twelve (12) month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, the United States Comptroller General, and their representatives to the related organizations books and records.

ALMA _000297

6.6     Access to Premises.  During normal business hours, ACO Participant agrees to provide Payor and ACO representatives access to ACO Participant's premises to inspect the premises and equipment used in the delivery of health care services to Participants, subject to any applicable State law.

## VII.  ACO RESPONSIBILITIES

7.1     Compliance and Law.  ACO will comply with all applicable state and federal laws and regulations.

7.2     Marketing.  ACO will market or arrange to market the services of ACO Participant in accordance with policies adopted by the ACO Board and applicable MSSP requirements.

7.3     Consent.  Neither ACO nor ACO Participant will use the other party's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise without the written consent of that party and will cease any such usage immediately upon written notice to the party or upon termination of this Agreement, whichever is sooner. Notwithstanding this limitation, ACO may include individual ACO Participant Providers and ACO Participant's name, address, telephone number, specialty, and practice availability in any listing distributed by ACO and Payor, indicating that individual provider and/or ACO Participant is an In-Network Provider.

7.4     Data Provision.  Subsequent to execution of this Agreement, ACO will provide ACO Participant with a list of In-Network Providers. ACO will provide to ACO Participant upon its reasonable request all Beneficiary-related demographic, clinical, and claims information reasonably necessary for ACO Participant to provide services pursuant to this Agreement.

## VIII.  ACO OPERATIONS

8.1     ACO Governance.  ACO shall at all times maintain a transparent governance structure that provides the ACO Participant meaningful opportunities for participation in the functions and strategic direction of the ACO. At all times, ACO Participating Providers from ACO Participants shall comprise at least seventy-five percent (75%) of the ACO's governing body, which shall have the authority to execute the functions of ACO and shall be responsible for oversight and strategic direction of ACO, and holding ACO management accountable for the ACO's activities. At all times, the ACO Board shall be separate and unique to the ACO, with the members of the ACO Board having a fiduciary duty to the ACO, and subject to the ACO's conflict of interest policy.

8.2     Quality Improvement.  In providing services in connection with this Agreement, ACO Participant and ACO Participant Providers will reasonably and in good faith take all actions reasonably necessary and required to improve quality of care and patient outcomes, including but not limited to the following actions:

a.      Reasonable compliance with all ACO clinical practice, disease management, quality improvement, provider performance, patient safety, employee and human resource, intellectual property, legal and regulatory compliance, indigent care, and other clinical-related policies and programs relating to ACO Participant services;

b.      Reasonable use of electronic medical record systems relating to ACO Participant services and cooperation with ACO and ACO Participants in the exchange of patient information between ACO Participants and other health care providers;

8

APPX 0311

c.     Reasonable adoption and use by ACO Participant and ACO Participant Providers of ACO clinical data repository to assist in management of clinical care with agreed upon protocols relating to ACO Participant services;

d.     Reasonable adoption and use by ACO Participant and ACO Participant Providers of ACO procedures to monitor and assure adherence to practice standards and protocols; and

e.     Reasonable participation in ACO programs to improve patient safety and patient loyalty.

8.3    Confidential Information.

a.     Definition.    The term "Confidential Information" includes all information, documentation, data, know-how, trade secrets and technology, practice standards, protocols, clinical practice, disease management, quality improvement, utilization review standards, practices and protocols, outcome data, analytics, business plans, bids, offers, proposals, financial data, computer software, proprietary methods, techniques, and strategies that are not in the public domain. The term "Confidential Information" does not include information that the other party possessed or maintained prior to the Effective Date that was not subject to a confidentiality agreement between the parties, is generally available in the health care industry, or may be rightfully obtained by the other party through third party sources.

b.     Obligation.    ACO and ACO Participant acknowledge that the other's Confidential Information disclosed to it pursuant to this Agreement is disclosed in confidence and with the understanding that it constitutes valuable information developed at great expenditure of time, effort and money. Further, ACO and ACO Participant acknowledge that any disclosure of Confidential Information to it by the other party is done in reliance upon the receiving party's representations and covenants in this Agreement. The parties agree not to use, duplicate or make any copies of the Confidential Information of the other except as necessary to carry out its responsibilities under this Agreement. Each party agrees to secure and protect the Confidential Information of the other party using all commercially reasonable means, but in no event will such means be less than those used by the party to secure and protect its own Confidential Information.    If any third party seeks to compel one party to disclose the other's Confidential Information, then such party will promptly notify the other party so that the party owning such Confidential Information has the opportunity to seek an appropriate protective order.

c.     Use of Information Following Termination.    Upon termination of this Agreement for any reason, each party will promptly return to the other party all material constituting or containing Confidential Information of the other party. Neither party will thereafter use, appropriate, reproduce, or disclose such Confidential Information to any third party, except to the extent such disclosure is required by law, pursuant to subpoena or other legal process. The parties acknowledge and agree that (i) in addition to the Confidential Information that each party owns separately and individually, during the term of the Agreement they will jointly create and develop certain Confidential Information ("Joint Confidential Information") in connection with services provided pursuant to the Agreement, (ii) they will not disclose, license, convey, or share such Joint Confidential Information to or with any third party during the term of this Agreement or following termination of the Agreement without the advance written consent of the other party, (iii) during the term of the Agreement the parties will use the Joint Confidential Information exclusively in connection with the provision of services under the Agreement, and (iv) following termination of the Agreement, either party

9

ALMA _000299

may continue to use, subject to (ii) above, the Joint Confidential Information for its own internal uses and business purposes. The term "Joint Confidential Information" does not include clinical processes and clinical intervention workflows.

8.4    Remedies.  Each party recognizes and agrees that violation or breach of Section 8.3 or Section 10.9 and Section 8.5 of this Agreement by one party may result in grievous and irreparable harm to the other party or parties, which harm may be difficult to quantify, and that no party will have an adequate remedy at law for breach of such covenants.  Therefore, all parties agree to waive the defense that the other party has an adequate remedy at law and agree that the other party may enforce its rights in equity by injunctive or other equitable relief, in addition to whatever other remedies may exist. Both parties also waive any requirement for the securing or posting of any bond in connection with the obtaining any such injunctive or other equitable relief.

8.5    Restrictive Covenant.  During the term of this Agreement and, subject to Section 10.4, in consideration for continued access to new confidential information, for one (1) year following termination of the Agreement, ACO Participant will not sponsor, form, own (in whole or in part), join, or participate in a competing ACO participating in the MSSP.

8.6    Survival.  The provisions of Sections 8.3, 8.5, and 10.9 will survive the termination of this Agreement.

8.7    Remediation.  Upon failure of ACO Participant or a ACO Participant Provider to comply with this Agreement, ACO policies and procedures, MSSP requirements, other program integrity issues, including those identified by CMS, or Payor Contract requirements, ACO Participant agrees to comply with a written corrective action plan agreed to by a majority of the ACO Board and that ACO may, upon approval of the two-thirds of an ad hoc committee comprised of one representative of each ACO Participant with more than 5% of attributed MSSP Beneficiaries, deny all or part of a MSSP financial incentive payment to ACO Participant.  ACO Participant further agrees that such a corrective action plan may require ACO Participant to impose upon an ACO Participant Provider, a corrective action plan or MSSP incentive payment denial.  The provisions of this Section 8.7 do not limit the other remedies available to ACO under this Agreement or ACO policies and procedures.

## IX. TERM AND TERMINATION

9.1    Term.  The initial term of the Agreement shall commence on the July 1, 2019 and continue until December 31, 2020 unless otherwise terminated in accordance with Section 9.2 below.  Upon expiration of the initial term, this Agreement shall automatically renew for successive one-year terms unless otherwise terminated as provided in this Agreement.

9.2    Termination.  This Agreement may be terminated as follows:

a.    by either party for cause, including, but not limited to, breach of this Agreement or failure to meet ACO performance standards, upon sixty (60) days' written notice following notice of the alleged breach and a 60-day opportunity to cure;

b.    by either party upon sixty (60) days' notice if either the CMS Agreement terminates or ACO Participant ceases to participate in the CMS Medicare Shared Savings ACO Program;

c.    by either party without cause upon written notice to the other party at least ninety (90) days prior to the end of the then-current term; or

10

APPX 0313

d.    by ACO upon thirty (30) days written notice to ACO Participant if the Centers for Medicare & Medicaid Services does not approve the addition of ACO Participant as a participant of ACO and ACO Participant and ACO are unable to resolve the issue with the Centers for Medicare & Medicaid Services by the end of the thirty (30) day period.

9.3    <u>Effect of Early Termination</u>.    ACO Participant understands and agrees that if this Agreement is terminated prior to the end of the term, ACO Participant is entitled to only the pro rata share of incentive or other payments received by ACO, such as shared savings payments pursuant to the MSSP, prior to the effective date of termination based on services provided by ACO Participant during the term of this Agreement. ACO Participant understands and agrees that if this Agreement is terminated prior to the end of the term, ACO Participant will continue to be liable for any losses ACO incurres during the then-current term of this Agreement.

9.4    <u>ACO Participant Notice and Option to Terminate</u>.  In the event of another ACO Participant's termination of its ACO agreement, ACO will notify ACO Participant within ten (10) days of such decision to terminate.  Within 10 days of receiving such notice, ACO Participant may choose to terminate this Agreement without cause.

### X.  MISCELLANEOUS PROVISIONS

10.1    <u>Assignment</u>.  No assignment of the rights, duties or obligations under this Agreement will be made by either party without the express written approval of the other party.    Any attempt at assignment in violation of this Section 10.1 will be void.

10.2    <u>Waiver of Breach</u>.  Waiver of breach of any term or provision of this Agreement  will not be deemed a waiver of any other breach of the same or different provision. In addition, waiver of any provision, obligation or duty as provided in this Agreement will not constitute a waiver of a future breach.

10.3    <u>Notices</u>.  Any notice required to be given pursuant to the terms and provisions of this Agreement will be given in writing, and will be sent by certified or registered mail, postage prepaid, return receipt requested.  Any notice given to ACO will be delivered to  ACO at the following address (or as otherwise specified in writing by the parties):

> Amarillo Legacy Medical
> ACO 1215 S Coulter St
> Ste 400
> Amarillo, TX 79106

Any notice given to ACO Participant will be sent by certified or registered mail, postage prepaid, return  receipt requested, to ACO Participant at the following address:

> Amarillo Family Physicians Clinic, P.A.
> 1215 Coulter, Suite 100
> Amarillo, TX 79106

10.4    <u>Severability</u>. In the event any term or provision of this Agreement is rendered invalid or unenforceable the remainder of the provisions of this Agreement will, subject to Section 10.5 of this Agreement, remain in full force and effect.

11

APPX 0314

10.5    Effect of Severable Provision.  In the event that a term or provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in Section 10.4 of this Agreement, and its removal has the effect of materially altering the obligations of either ACO Participant or ACO in such a manner as, in the judgment of the affected party:

a.    will cause financial hardship to such party or (b) will cause such party to act in violation of its governing or organizational documents, the party so affected will have the right to terminate this Agreement upon thirty (30) days' prior written notice to the other party.

10.6    Entire Agreement.  This Agreement, together with the attached exhibits and attachments, all of which are incorporated herein by reference, memorializes the entire Agreement between ACO Participant and ACO relating to the rights granted and the obligations assumed by the parties concerning the provision of health care services to Participants.  Any prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement, including, without limitation, the First Amended and Restated Participation Agreement by and between the parties, not expressly set forth herein, are of no force or effect.

10.7    Amendment.  This Agreement or any part or section of it may be amended pursuant to the mutual written agreement of the parties. All other amendments or alterations of this Agreement without the written consent of both parties will be considered null and void.

10.8    Headings.  The headings of articles and sections contained in this Agreement are for reference purposes only and should not affect in any way the meaning or interpretation of this agreement.

10.9    Confidentiality of Agreement.  The terms of this Agreement are confidential and will not be disclosed, except as necessary for the performance of this Agreement or as required by law.

10.10    Governing Law and Disputes.    This Agreement will be construed and governed according to the laws of the State of Texas, without giving effect to its conflict of laws provisions. Except for either party's right to injunctive relief hereunder, any dispute arising out of or relating to this Agreement that is unresolved following the dispute resolution process set forth in Section 10.10 will be subject to confidential mediation and arbitration before the American Arbitration Association, under its rules of procedure.  Such arbitration will take place in Amarillo, Texas, and the decision of said tribunal will be binding upon the parties.  Such arbitration, its terms and all materials related to the arbitration, will be confidential. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

**(REMAINDER OF PAGE INTENTIONALLY BLANK)**

## SIGNATURE PAGE

**For the ACO:**

**AMARILLO LEGACY MEDICAL ACO**
[Legal Entity Name]

By: _William C Bgg_
Authorized Signatory

Name: _William C Briggs MD_

Title: _CEO_

Date: _Feb 15, 2019_

Address: _1215 S. Coulter, Ste 400_

City/State/Zip Code: _Amarillo TX 79106_

Business Phone: _806 358 8331_

**For the ACO Participant:**

**Amarillo Medical Specialists, LLP**
[Legal Business Name]

_____
DBA Name (if applicable)

By: _William C Bgg MD_
Authorized Signatory

Name: _William C Briggs MD_

Title: _Managing Partner_

Date: _Feb 15, 2019_

Address: _1215 S. Coulter St, Ste 400_

City/State/Zip Code: _Amarillo, TX 79106_

Business Phone: _806 358 8331_

13

**APPX 0316**

## ATTACHMENT A

## MSSP PARTICIPATION

1.    **Overall ACO Participant Commitment**.    ACO Participant agrees, and shall ensure its ACO Participant Providers agree, to use commercially reasonable efforts to assist ACO in fulfilling its purpose under the MSSP, which includes, but is not limited to, the promotion of evidence-based medicine, the promotion of patient engagement, and the development of an infrastructure for ACO participating or affiliated providers to internally report on quality and cost metrics that enables ACO to monitor, provide feedback, and evaluate its participating or affiliated providers' performance and to use these results to provide better care for individuals, improved health for populations and lower per capita growth in expenditures for MSSP Beneficiaries.

2.    **MSSP Requirements**.  The ACO Participant, each of its ACO Participant Providers and other providers will comply with the requirements and conditions of the Medicare Shared Savings Program (42 C.F.R. Part 425); (b) agree to become accountable for the quality, cost, and overall care of the MSSP Beneficiaries assigned to ACO under the MSSP; (c) will comply with and implement ACO's processes to promote evidence-based medicine and patient engagements, as required by 42 C.F.R. 425.112; (d) shall be held accountable for meeting ACO's performance standards for each required process as required under this Agreement; (e) comply with all relevant statutory and regulatory provisions regarding the appropriate use of data including the HIPAA Privacy Rule, HIPAA Security Rule and the terms of ACO's Data Use Agreement ("DUA") with CMS; and (f) agree to work with ACO to meet the quality reporting standards of the MSSP. To the extent that any MSSP requirement conflicts or is  inconsistent with any provision of this Agreement, the MSSP requirement will prevail.  ACO Participant and ACO Participant Providers shall, and ACO Participant shall require its ACO Participant Providers to, comply with all requirements of ACO's compliance program.

3.    **Shared Savings**.  If ACO Participant or an ACO Participant Provider receives from ACO a "financial incentive" (as defined under applicable law or Policies and Procedures) related to the performance of ACO Participant's, or any ACO Participant Provider's, duties under this Agreement, ACO Participant agrees that no payments shall be made directly or indirectly to ACO Participant or any ACO Participant Provider as an inducement to reduce or limit medically necessary services.  ACO shall make the updated Performance Distribution Plan available to ACO Participant upon adoption by the ACO Board. ACO Participant understands that such financial incentives may include the opportunity to receive shared savings or other payments intended to encourage ACO Participant and the ACO Participant Providers to adhere to the ACO's quality assurance and improvement program, CMS reporting requirements, and evidence-based clinical guidelines.  The total amount of incentive compensation, and its distribution to ACO Participant, shall be consistent with fair market value for the services provided and shall not take into account the volume or value of referrals of designated health services ("DHS") or other business generated for any DHS entity affiliated with a member of the ACO. The total amount of incentive compensation, and its distribution, may be subject to review and assessment of reasonable compensation limits, as determined by the ACO Board in its reasonable discretion, for compliance with Stark legislation (42 U.S.C. 1395nn) and the Social Security Act's Anti-kickback statute (42 U.S.C. Section 1320a-7b(b)).

      a.    Pursuant to the Performance Distribution Plan, financial incentives are intended to encourage ACO Participant and ACO Participant Providers to follow ACO quality assurance and improvement programs and evidence-based clinical guidelines.  Under the Performance Distribution Plan, reward of financial incentives by ACO is directly related to compliance with ACO quality assurance and improvement programs and evidence-based clinical guidelines.

14

b.     ACO Participants and ACO Participant Providers agree to use best efforts to comply with ACO's Performance Measures.  ACO Participants and ACO Participant Providers agree to maintain an effective care management system, as determined by ACO, or to contract directly with an ACO Participating Provider to provide care management services.

c.     Upon failure of ACO Participant or an ACO Participant Provider to achieve Performance Measures set by ACO, ACO may offset any loss ACO experiences due to ACO Participant's or ACO Participant Provider's failure to meet Performance Measures from ACO Participant's financial incentive reward or APM Bonus, as described below, and pursuant to the Performance Distribution Plan.

4.     **APM Bonus Reassignment**. ACO Participants agree to assign any and all portions of the APM Bonus it is eligible to receive to ACO as funding for ACO expenses related to providing downside risk protection (reinsurance costs, bank fees, etc.). The reassigned APM Bonus will be held in a savings account until CMS adjudicates any earned shared savings payments or incurred losses.  In the event ACO earns shared savings payments sufficient to cover its expenses related to providing downside risk protection, such shared savings payments shall be used.  Any remaining APM Bonus payments held in savings shall be distributed to ACO Participants as approved by the ACO Board.  On an annual basis, the ACO Board shall determine the percentage of APM Bonus to be reassigned, if any, by ACO Participant and give notice of such determination by distribution of a modified Performance Distribution Plan at least 30 days prior to the deadline for notice of non-renewal in Section IX of this Agreement.

5.     **CMS Agreement Renewal**.  Subject to Section 9.3 of the Agreement, during the third year of the CMS Agreement, the parties will commence discussions regarding modifications of the Agreement as relevant to the CMS Medicare Shared Savings ACO Program that either party believes are necessary as a result of any anticipated changes to the CMS Medicare Shared Savings ACO payment arrangement to be in effect during the following term.

6.     **Quality Reporting**.  ACO, on behalf of ACO Participant Providers who bill under the TIN of an ACO Participant, must submit all of the CMS web interface measures determined under 42 C.F.R. § 425.500 to satisfactorily report on behalf of ACO Participant Providers for purposes of the quality performance category of the Quality Payment Program (QPP).  Accordingly, during the term of this Agreement and following termination of this Agreement, ACO Participant hereby agrees to work cooperatively and in good faith with ACO regarding any processes or procedures that are necessary to submit information required by CMS including the timely and accurate submission of quality reporting data related to the applicable calendar year and in a manner that will not jeopardize the incentive payments that may be available to other professionals participating in the ACO. Additionally, ACO Participant agrees to use reasonable efforts to adopt and utilize ACO's data reporting infrastructure.  ACO Participant and each ACO Participant Provider shall comply with all data requests for ACO QPP reporting in a timely manner in strict accordance with a published schedule adopted by the ACO Board.  In addition, failure to meet quality benchmarks established by the ACO Board may result in actions referenced in Section 8.7 of the Agreement.

7.     **Beneficiary Notification**. ACO Participant and ACO Participant Providers must notify MSSP Beneficiaries at the point of care that their ACO providers/suppliers are participating in the MSSP and of the opportunity to decline claims data sharing under 42 C.F.R. §§ 425.708 and 425.312. For purposes of this obligation, notification is carried out when ACO Participant posts signs in its facilities and, in settings in which MSSP Beneficiaries receive primary care services, by making standardized written notices available upon request. Such posted and written notices will use template language developed by CMS for such notifications.

ALMA _000305

8.    **CMS Demonstration Project Limitations**.  During participation in the MSSP by ACO, ACO Participant agrees and understands that ACO Participant and ACO Participant Providers may not participate in CMS demonstration projects that duplicate shared savings payments received under the MSSP including, but not limited to:  (i) a model tested or expanded under section 1115A of the Social Security Act (the CMS Innovation Center0 that involves shared savings under Title XI of the Social Security Act or any other program or demonstration project that involves such shared savings; (ii) the independence at home medical practice pilot program under section 1866E of the Social Security Act; (iii) the Medicare Health Care Quality (MHCQ) Demonstration Programs; (iv) Multipayer Advanced Primary Care Practice (MAPCP) demonstration; and (v) the Physician Group Practice (PGP) Transition Demonstration.

ALMA _000306

**APPX 0319**

3.    **Obligations of Business Associate**.

a.    Business Associate shall not use or further disclose PHI other than as permitted or required by this Agreement, this Exhibit or as required by law.

b.    Business Associate shall employ administrative, physical and technical safeguards, consistent with the size and complexity of Business Associate's operations, to ensure that PHI is used and disclosed in accordance with the terms of this Agreement and this Exhibit. Business Associate shall comply with the security standards set forth at 45 CFR §§ 164.308, 164.310, 164.312 and 164.316. The additional requirements of the ARRA that relate to privacy and security and that are made applicable with respect to Covered Entities shall also be applicable to Business Associate and shall be and by this reference are incorporated into this Exhibit.

c.    Business Associate shall mitigate, to the extent practicable, any harmful effect of a use or disclosure of PHI known to Business Associate in violation of this Agreement and this Exhibit.

d.    Business Associate shall report to Covered Entity any use or disclosure of PHI not provided for by this Agreement and this Exhibit of which it becomes aware, including any Security Incident of which it becomes aware and is material to Covered Entity's compliance with HIPAA or the ARRA.

e.    Business Associate shall ensure that any agent, including a subcontractor, to whom it provides PHI received from or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Exhibit to Business Associate with respect to such information.

f.    Business Associate shall provide access to PHI in designated record sets to Covered Entity at the request of Covered Entity, or, if directed by Covered Entity, to a Patient in order to meet the requirements of HIPAA.

g.    Within twenty (20) days of a request by Covered Entity, Business Associate shall provide to Covered Entity all PHI in Business Associate's possession necessary for Covered Entity to provide Patients or their representatives with access to or copies thereof in accordance with 45 CFR § 164.524 and Section 13405(e) of the ARRA.

h.    Within twenty (20) days of a request by Covered Entity, Business Associate shall provide to Covered Entity all information and records in Business Associate's possession necessary for Covered Entity to provide Patients or their representatives with an accounting of disclosures thereof in accordance with 45 CFR § 164.528 and Section 13405(c) of the ARRA. Business Associate shall track and record all such disclosures to ensure compliance with this Section.

i.    Within twenty (20) days of a request by Covered Entity, Business Associate shall provide to Covered Entity all PHI in Business Associate's possession necessary for Covered Entity to respond to a request by a Patient to amend such PHI in accordance with 45 CFR § 164.526. At Covered Entity's direction, Business Associate shall promptly incorporate any amendments to PHI made by Covered Entity into the information maintained by Business Associate.

j.    Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to HHS in accordance with HIPAA.

k.    Business Associate shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI that it receives, maintains, transmits or creates on behalf of Covered Entity and shall ensure that any agent, including a subcontractor, to whom it provides PHI also agrees to implement such safeguards to protect it.

19

l.    Business Associate shall notify Covered Entity of any Breach of unsecured PHI of which it becomes aware without unreasonable delay but in no event more than sixty (60) days after Business Associate's discovery of such Breach. The notification shall include the identification of each individual whose unsecured PHI was affected by the Breach to the extent known by Business Associate.

4.    **Obligations of Covered Entity**.

a.    Covered Entity shall promptly notify Business Associate of any limitation in its notice of privacy practices in accordance with 45 CFR 164.520 to the extent that such changes affect Business Associate's permitted use or disclosure of PHI.

b.    Covered Entity shall promptly provide Business Associate with any changes in, or revocation of, permission by a Patient to the use or disclosure of PHI.

c.    Covered Entity shall promptly notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to.

d.    In the event that Covered Entity amends any PHI in its possession, a copy of which is also retained by Business Associate, Covered Entity shall promptly notify Business Associate of such amendment.

e.    Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under HIPAA or the ARRA if done by Covered Entity.

5.    **Term and Termination**. This Exhibit shall commence as of the Effective Date and, except as provided in Section 6 below, continue until the expiration or earlier termination of this Agreement. In the event either Party becomes aware of a pattern of activity or practice of the other Party that constitutes a material breach of the other Party's obligations under this Exhibit, the non-breaching Party shall give written notice to the breaching Party of the breach. If the breaching Party does not cure the breach within a reasonable time period specified by the non- breaching Party, the non-breaching Party may terminate this Exhibit and this Agreement, or if termination is infeasible, report the breach to HHS.

6.    **Effect of Termination.** Upon the expiration or earlier termination of this Agreement, Business Associate shall return to Covered Entity the PHI created or received by Business Associate from or on behalf of Covered Entity, or upon Covered Entity's request, shall destroy such information. If the return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Exhibit to such PHI and limit its further use or disclosure to purposes that make its return or destruction infeasible for so long as Business Associate maintains such PHI. Further, Business Associate may retain PHI of the Covered Entity that is de-identified of any individually identifiable health information as may be reasonably necessary for maintenance of the system integrity of Business Associate's information technology systems or for ongoing data aggregation or reporting requirements related to the Programs. Covered Entity and Business Associate acknowledge that Business Associate's need to retain certain records until the expiration of applicable statutes of limitation for liability with respect to such records and for occurrences reflected therein would render return or destruction of such records infeasible within the meaning of this Section until the expiration or termination of such statutes of limitation, obligations and needs.

7.    **Regulatory References and Amendment.** A reference in this Exhibit to HIPAA or to the ARRA shall mean the Law as in effect or as amended and for which compliance is required. If either HIPAA or the ARRA is amended or interpreted in any manner that renders this Exhibit inconsistent therewith, the Parties shall negotiate in good faith to amend this Exhibit to the extent necessary to comply with such amendments or interpretations.

ALMA _000308

8.  **General.**  Except as expressly modified by this Exhibit, all other provisions of this Agreement shall remain in full force and effect. The Agreement and this Exhibit are intended to be read and construed in harmony with each other, but in the event that any provision in this Exhibit conflicts with the provisions of this Agreement (including any of its other Exhibits or attachments), the provisions in this Exhibit shall be deemed to control, and such conflicting provision or part thereof shall be deemed removed and replaced with the governing provision in this Exhibit.

9.  **No Third Party Beneficiary.**  The provisions and covenants set forth in this Exhibit are expressly entered into only by and between Business Associate and Covered Entity, and are only for their benefit. Neither Business Associate nor Covered Entity intends to create or establish any third party beneficiary status or right (or the equivalent thereof) in any other third party and no such third party shall have any right to enforce or enjoy any benefit created or established by the provisions and covenants in this Exhibit.

21

APPX 0322

## ATTACHMENT C
## BUSINESS ASSOCIATE ADDENDUM

Under this Attachment C, ACO Participant shall have all the rights and obligations of a Covered Entity (as defined below) and ACO shall have all the rights and obligations of a Business Associate (as defined below).

1.    **Definitions**.  For purposes of this Exhibit, terms used, but not otherwise defined herein or in this Agreement, shall have the same meaning as those terms are used and defined by the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 and the regulations promulgated by the U.S. Department of Health and Human Services (*"HHS"*) thereunder (*"HIPAA"*), and the American Recovery and Reinvestment Act of 2009 and any regulations promulgated thereunder (the *"ARRA"*).

a.    *"Breach"* shall mean the acquisition, access, use, or disclosure of PHI in a manner not permitted by HIPAA which compromises the security or privacy of the PHI.

b.    *"Business Associate"* shall have the meaning given to such term under HIPAA.

c.    *"Covered Entity"* shall have the meaning given to such term under HIPAA.

d.    *"Patient"* shall have the same meaning as the term "individual" under HIPAA and shall include a person who qualifies as a personal representative.

e.    *"Protected Health Information"* or *"PHI"* shall have the same meaning as such term is defined in HIPAA, and shall be limited to the information received, used, disclosed, created, maintained and/or transmitted by Business Associate on behalf of Covered Entity.

f.    *"Security Incident"* means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

2.    **Permitted Uses and Disclosures by Business Associate**.

a.    Business Associate may use or disclose PHI to carry out its obligations under this Agreement.

b.    Business Associate may use or disclose PHI for the proper management and administration of the Business Associate, including its CI Program, or to fulfill any present or future legal responsibilities of Business Associate.

c.    Business Associate may use or disclose PHI provided the disclosure is required by Law; provided, however, that if Business Associate discloses PHI to a third party for such purpose Business Associate obtains reasonable assurances from the person to whom the disclosure is made that such PHI will be held confidentially and used or disclosed only as required by Law or for the purpose that the disclosure was made and that such person is obligated to notify Business Associate of any instances of which it is aware in which the confidentiality of PHI has been breached.

d.    Business Associate may use PHI to provide data aggregation services to Covered Entity, as permitted by Law.

e.    Business Associate may use PHI to report violations of Law to appropriate Federal and State authorities, consistent with 45 CFR § 164.502(j)(1).

18

ALMA _000310

ATTACHMENT B

## LIST OF ACO PARTICIPANT PROVIDERS

| Name of Clinician | Medical Specialty | NPI Number |
|---|---|---|
| Mark E. Stevens, M.D. | Family Medicine | 1891732897 |
| David E. Brister, M.D. | Family Medicine | 1568409589 |
| Victor L. Bravo, M.D. | Family Medicine | 1528012044 |
| David L. Tyson, M.D. | Family Medicine | 1497702708 |
| James D. Bryan, M.D. | Family Medicine | 1962449934 |
| Bart A. Britten, M.D. | Family Medicine | 1083757504 |
| J. Brian Malone, D.O. | Family Medicine | 1295920163 |
| Julie R. Allman, M.D. | Family Medicine | 1700822004 |
| Abby S. Leake, M.D. | Family Medicine | 1467686394 |
| Armando Salcido, M.D. | Family Medicine | 1467779934 |
| Jorge Barajas, M.D. | Family Medicine | 1376657809 |
| Lance S. Martin, M.D. | Family Medicine | 1104147990 |