IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| AMARILLO MEDICAL SPECIALISTS, LLP, *et al.*, | |
| Plaintiffs, | |
| v. | 2:23-CV-026-Z-BR |
| AKOS MD IPA, LLC, *et al.*, | |
| Defendants, | |
| GENUINE HEALTH GROUP, LLC, | |
| Third-Party Plaintiff, | |
| v. | |
| MARY BLACK, | |
| Third-Party Defendant. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant and Third-Party Plaintiff Genuine Health Group LLC's ("GHG") Motion for Sanctions ("Motion"), filed October 2, 2025. ECF No 175. Plaintiffs responded on October 30, 2025. ECF No. 182. GHG replied on November 13, 2025. ECF No. 196. The Court held a hearing on the Motion on December 5, 2025. *See* ECF Nos. 204, 206.

The Motion is now ripe. Having considered the Motion, briefing, and relevant law, the Court **GRANTS** the Motion. The Court **AWARDS** GHG all reasonable expenses incurred in litigating this Motion, including attorney's fees.

This case is **DISMISSED** with prejudice. All other pending motions are **DENIED** as moot. ECF Nos. 125, 153, 154, 157, 170.

BACKGROUND

Plaintiffs Amarillo Medical Specialists, LLP ("AMS"), Amarillo Family Physicians LLP ("AFP"), and Amarillo Legacy Medical ACO LLC first filed this action in Texas state court on January 13, 2023. *See* ECF No. 1 at 1. Defendants received a citation and Plaintiffs' Original Petition on January 23, 2023. *See id.* Next, Defendants removed the case to this Court pursuant to 28 U.S.C. Section 1441 on February 21, 2023. *See id.*

Defendants are GHG, a Florida limited liability company, and AKOS MD IPA, LLC ("AKOS"), an Arizona limited liability company. *See id.* at 2. Plaintiffs originally brought four causes of action: (1) breach of contract; (2) tortious interference with contract; (3) fraud and fraudulent inducement; and (4) negligence. *See id.* at 8–9. Plaintiffs initially brought only the tortious interference claim against GHG, and the other claims against only AKOS. *See id.*

On April 20, 2023, Plaintiffs amended their Complaint to add "tortious interference with prospective contract" as a fifth cause of action against both Defendants. ECF No. 22 at 8. The Amended Complaint added GHG as co-defendant as to two causes of action: fraud and fraudulent inducement, and negligence and negligent misrepresentation. The Amended Complaint did not alter Plaintiffs' breach of contract (against AKOS only) and tortious interference with contract (against GHG only) claims. Plaintiffs seek damages "in the amount of at least $3 million dollars." *Id.* at 7.

This litigation arises from a prospective business relationship between Plaintiffs and AKOS—and, as Plaintiffs allege, also with GHG. "On or around April 6, 2022," AKOS approached Plaintiffs "with a proposition for Plaintiffs to participate in" AKOS's Accountable Care Organization ("ACO"). ECF No. 155 at 9. "An ACO is an organization of health care practitioners that agrees to be accountable for the quality, cost, and overall care of Medicare beneficiaries who are enrolled in the traditional fee-for-service program who are assigned to it." ECF No. 165 at 2. "The purpose of an ACO is for a group of doctors with a patient base of

at least 5,000 Medicare patients to better manage the care of its patients," with the goal of "achiev[ing] a reduction in healthcare costs over time." *Id.* (quoting *Enable Healthcare, Inc. v. Cleveland Quality Healthnet, LLC*, No. 1:16 CV 2395, 2017 WL 3116680, at *1 (N.D. Ohio July 20, 2017)).

The ACO program is administered "by the federal Centers for Medicare & Medicaid Services ('CMS')." ECF No. 165 at 2. "CMS holds annual enrollment periods, and its enforcement of these deadlines is strict." *Id.* (collecting authorities); *see also id.* at 3 (noting that the deadline to enroll in an ACO for 2022 was September 2); ECF No. 209 at 2 n.1 (similar). CMS incentivizes healthcare providers to participate in the ACO program by paying providers "a share of any savings when the actual per capita expenditures of their assigned Medicare beneficiaries are a sufficient percentage below their specified benchmark amount." ECF No. 165 at 2. In other words, "if the ACO is able to reduce spending by a certain target, the savings is shared between CMS and the ACO." *Id.* at 2–3 (quoting *Enable Healthcare*, 2017 WL 3116680, at *1). The reverse is true, too: "ACOs that lose money must pay Medicare for the losses." *Id.* at 3 (quoting *United States v. Millennium Physician Grp.*, No. 2:16-CV-798, 2023 WL 2022228, at *2 (M.D. Fla. Feb. 15, 2023)). "A healthcare provider can only be enrolled in one ACO at a time, a fact which is common knowledge." *Id.*

"From January 1, 2013, until December 2022," Plaintiffs AMS and AFP "were enrolled [in] the Amarillo Legacy Medical ACO." ECF No. 165 at 3. In 2022, AMS and AFP began considering alternative ACOs. *See id.* One option was to "continue functioning under their existing structure." *Id.* Another was to "move to an ACO Reach, a new ACO structure under

the Affordable Care Act."[1] *Id.* AMS and AFP "had to sign with one (or more) ACO by early August" 2022, and had to "choose a single, exclusive ACO by September 2, 2022." *Id.*

In April 2022, AFP "was approached by Mary Black, an employee of AKOS." ECF No. 165 at 3. Ms. Black attempted to persuade AFP and AMS to join a proposed ACO Reach program run by AKOS, subject to CMS approval. *See id.*; *see also* ECF No. 155 at 17–18 (noting that AKOS had "request[ed]" CMS approval "to become an ACO Reach vendor"). At that time, CMS had *not* approved AKOS's ACO Reach application. Plaintiffs nonetheless "began negotiating with Ms. Black." ECF No. 165 at 3. On August 2, 2022, Dr. William Biggs[2] "agreed to contract with AKOS." ECF No. 155 at 11. But this was a one-sided "contract": AKOS never signed this "contract," or any other "contract," with Plaintiffs. *See* ECF No. 183 at 5–33 (Participation Agreement unexecuted by either party); *id.* at 34–36 (Provider Joinder Agreement executed only by employees of Plaintiffs). These agreements were "two parts" of the same alleged "contract." ECF No. 182 at 2. Had the "contract" been fully executed, Plaintiffs *would* have joined AKOS's yet-to-be-formed, still-subject-to-CMS-approval ACO Reach.

But, again, neither part of this "contract" is signed by AKOS. And GHG is not a party to either agreement. In fact, neither agreement mentions GHG at all. Despite this, Plaintiffs have repeatedly referred to AKOS and GHG as a joint entity in their briefing. *See, e.g.*, ECF No. 182 at 2 ("AFP executed a contract with AKOS/GHG . . . ."); *id.* at 3 (noting that an

---

[1] *See ACO Realizing Equity, Access, and Community Health (REACH) Model*, CTRS. FOR MEDICARE & MEDICAID SERVS. 2 (Apr. 2022), https://www.cms.gov/priorities/innovation/media/document/aco-reach-genfaqs [https://perma.cc/UY8P-J5VP].

[2] Dr. Biggs is "managing partner of Plaintiff AMS" and "CEO and Medical Director" of Amarillo Legacy Medical ACO. ECF No. 126 at 17. He is also Plaintiffs' designated expert witness as to damages. *See, e.g.*, ECF No. 130 at 9.

4

employee of Plaintiffs "testified that they had an agreement with AKOS/GHG"); ECF No. 165 at 16 (referring to "the AKOS/GHG ACO").

Despite the centrality of a fully executed "contract" between Plaintiffs and AKOS, Plaintiffs never produced conclusive evidence of said "contract" in the three-plus years since filing suit.[3] *See* ECF No. 182 at 2 ("Plaintiffs cannot locate their copy of the Participation Agreement . . . ."); *id.* at 4 ("AFP has clearly executed the Participation Agreement which it now cannot find."). Even the part of the contract that Plaintiffs describe as "fully executed"— the three-page Provider Joinder Agreement, which appears to be a mere addendum—is signed only by Plaintiffs. *Id.* at 2.

Shockingly, Plaintiffs abandoned their decade-old ACO on the day of the CMS registration deadline—based on a supposed contract that they "now cannot find." *Id.* at 4.[4] Yet, that missing contract is a core document in this long-running lawsuit wherein Plaintiffs seek millions of dollars in damages.

While "GHG and AKOS had anticipated a potential transaction in which a yet-to-be-formed subsidiary of GHG to be called Genuine Health Southwest ACL, LLC would purchase AKOS," AKOS was *not* a subsidiary of GHG, nor was there any formal legal relationship between AKOS and GHG. ECF No. 155 at 9–10 (citation modified). GHG and AKOS were still negotiating, and GHG's plan to purchase AKOS was contingent upon AKOS qualifying for CMS's new ACO Reach program. *See* ECF No. 155 at 25 (noting that GHG's agreement with AKOS provided for "automatic termination" in the event AKOS failed to qualify for

---

[3] At the December 6 hearing, Mr. Biggs claimed that only AFP's contract with AKOS is unexecuted, and that Plaintiff AMS did enter into a fully executed contract with AKOS. *See* ECF No. 206 at 38. That is not the case. *See* ECF No. 165-1 at 197, 220 (signature pages bearing only Dr. Biggs's signature on behalf of AMS).

[4] At the hearing, Mr. Biggs agreed: "Well, I agree it's shocking and I'm disappointed in my client . . . ." ECF No. 206 at 106.

Reach (citation modified)). Ultimately, AKOS failed to qualify for the ACO Reach program. *See* ECF No. 206 at 78 (counsel for GHG noting that "[w]hat happened was AKOS fell apart. They couldn't participate in the Reach ACO"); ECF No. 155 at 10 ("But the plans for that acquisition were abandoned in December 2022 because AKOS failed to qualify to provide Reach ACO services.").

Though GHG never completed its planned acquisition of AKOS, the parties agree that GHG was involved in the negotiations between Plaintiffs and AKOS. Plaintiffs and GHG dispute the *degree* of said involvement. Plaintiffs claim that "AKOS quickly represented that it was in a business arrangement with" GHG "and provided documents to support this." ECF No. 165 at 3. For example, on July 26, 2022, Plaintiffs contend that AKOS sent Plaintiffs billing codes for the proposed Reach ACO on GHG letterhead. *Id.* at 3–4. Later, during a meeting on August 4, 2022, Plaintiffs received a "Shared Savings Visual," drafted by Sean Leimbach of GHG,[5] that "provided a visualization of how the revenue generated under GHG's ACO would be allocated, with GHG receiving 30% of the revenue." *Id.* at 4. GHG presented this Visual again at a second meeting on September 2, 2022. *See* ECF No. 165 at 6–7; ECF No. 155 at 10. For its part, GHG insists that these were "hypothetical projections for illustrative purposes only." *Id.* at 11.

Additionally—and crucial to the disposition of this case—Plaintiffs repeatedly stated that AKOS "unequivocally" and "immediately" represented that they were GHG's direct subsidiary at an August 4 meeting, *at the time of said August 4 meeting*. The bulk of these representations came from the Affidavit of Mary Jo Zallar, who was COO of Amarillo Legacy Medical ACO and AKOS's "primary contact with Plaintiffs." ECF No. 33 at 3. Ms. Zallar's Affidavit stated that AKOS "immediately represented that it was a subsidiary of GHG," that

---

[5] Sean Leimbach was GHG's Chief Strategy Officer. *See* ECF No. 165 at 4.

"AKOS, with the approval of GHG, repeatedly represented that it was acting as an agent for GHG," and that GHG "wrote [to] Plaintiffs" directly on July 29, 2022. ECF No. 20-1 at 3–4. Ms. Zallar further swore that "[d]uring this meeting [Sean] Leimbach made it unequivocally clear that: (1) AKOS was GHG's subsidiary, (2) AKOS, as GHG's subsidiary, was acting as GHG's agent, (3) ALMA, AMS, and AFP would be joining a GHG ACO, and (4) GHG's ACO would provide substantially more revenue" than Plaintiffs' "existing ACO." *Id.* at 5.

But none of these statements were true.

During her deposition on August 6, 2024, Ms. Zallar testified that no party ever used the word "subsidiary" during the August 4 meeting:

> **Q.** Even Mary Black never said to you . . . the word subsidiary?
>
> **A.** No.

ECF No. 176-4 at 7 (citation modified for readability). Ms. Zallar also admitted that AKOS never "represented that it was acting as an agent for GHG and its ACO" and agreed that "GHG did not make the communication listed on July 29 to the Plaintiffs." *Id.* at 7, 9. To illustrate how Ms. Zallar's deposition testimony flatly contradicted her Affidavit, the Court quotes from her deposition:

> **Q.** The last sentence in paragraph 10 [of your Affidavit] says: "AKOS, with the approval of GHG, repeatedly represented that it was acting as an agent for GHG and its ACO." That never happened, did it?
>
> **A.** No. That's what we were led to believe, that it was with the approval of GHG.
>
> **Q.** That's what you assumed?
>
> **A.** Yes.
>
> **Q.** But it's not a fact, as stated in your affidavit?
>
> **A.** No.
>
> **Q.** Why did you say it in your affidavit if it wasn't true?

**A.** Some of this was drafted for me, and I just—I left it as it was worded.

**Q.** Did you understand that this was going to be filed as a sworn statement with the Court?

**A.** I guess not to the extent that you're saying, yeah. I should have changed the verbiage.

*Id.* at 7–8 (citation modified for readability).

Ms. Zallar further admitted that she knew key portions of her Affidavit were false at the time she signed it:

**Q.** Would you agree with me that the language used in paragraph 10 appears to have been designed to make the relationship between GHG and AKOS something more than what it had actually been represented to be?

**A.** It's probably stronger than what [the relationship] was represented to be.

**Q.** Well, and it's not factually correct, right?

**A.** Well, you know, we know that now.

**Q.** Well, you knew it when you signed the document, to be fair; you just adopted someone else's words, right?

**A.** Yes.

*Id.* at 8 (citation modified for readability). And she admitted that Plaintiffs received no communications from GHG on July 29—contrary to her Affidavit, which stated that AKOS and GHG both "wrote Plaintiffs" on that date:

**Q.** Your affidavit is incorrect that the Defendants, which includes GHG, wrote anything to the Plaintiffs on July 29th, correct?

**A.** Well, the Defendants, as in [AKOS].

**Q.** But you understand that [AKOS] is one company and is not the only Defendant in this lawsuit?

**A.** Yes. So it should have been, "One Defendant wrote."

**Q.** GHG did not make the communication listed on July 29 to the Plaintiffs?

8

**A.** Correct.

*Id.* at 9 (citation modified for readability).

Most troublingly, Ms. Zallar flip-flopped on *how* GHG allegedly described its relationship with AKOS. Her Affidavit stated that GHG "made it unequivocally clear" that "AKOS was GHG's subsidiary" and Plaintiffs "would be joining a GHG ACO." ECF No. 20-1 at 5. That was false, too:

> **Q.** The next thing [your Affidavit] says is: During this meeting, Leimbach made it unequivocally clear to me that AKOS was GHG's subsidiary. That's also untrue, correct?
>
> **A.** Yes.
>
> **Q.** Sean Leimbach never told you that AKOS was GHG's subsidiary?
>
> **A.** I don't believe so.
>
> **Q.** Second paragraph or second bullet point in paragraph 19 states that: Leimbach made it unequivocally clear that AKOS, as GHG's subsidiary, was acting as GHG's agent. That's not true, is it?
>
> **A.** No. Again, this—I accepted language that was drafted for me.
>
> **Q.** Language that you are now testifying to be untrue, correct?
>
> **A.** Not correct, yes.

ECF No. 176-4 at 11 (citation modified for readability).

Ms. Zallar's Affidavit caused the Court to believe that AKOS and GHG had a close relationship when the opposite was true. Ms. Zallar knew her Affidavit was false or misleading in key, material respects when she submitted it to the Court on April 20, 2023. Only when she was deposed did the truth finally come to light.

But Plaintiffs' malfeasance did not stop at the mere *submission* of a false Affidavit. Plaintiffs cited Ms. Zallar's Affidavit over a dozen times in asking the Court to deny GHG's Motion to Dismiss. And the Court *relied* on said Affidavit when it denied GHG's Motion to

Dismiss on June 30, 2023. *See* ECF No. 37 (citing Plaintiffs' Response in Opposition, which repeatedly referred the Court to the Zallar Affidavit).

For example, Plaintiffs wrote that "GHG disputes the nature of the video calls between GHG and Plaintiffs. Plaintiffs assert they were told that AKOS was GHG's subsidiary by Sean Leimbach, the 'Chief Strategy Officer' at [GHG], and that Plaintiffs would be joining GHG's ACO." ECF No. 33 at 14 (citing ECF No. 20-1); *see also id.* at 5 (citing the Zallar Affidavit for the contention that GHG "made it unequivocally clear" that AKOS was a GHG subsidiary and GHG's agent); *id.* ("Leimbach directly informed Plaintiffs that they would be participating in GHG's ACO."). As shown above, these assertions were provably false—or, at best, intentionally misleading.

The Court took Plaintiffs at their word, assumed the Zallar Affidavit was truthful, and this litigation lingered, languished, and limped along for nearly three (3) more years.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 11 authorizes federal district courts to sanction a party or attorney who files a pleading for an improper purpose or without sufficient legal and factual backing. Rule 11(a) requires that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented." FED. R. CIV. P. 11(a). Rule 11(b) sets out four specific representations that parties and counsel make when they file a document in federal court:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED. R. CIV. P. 11(b).

Rule 11's "central purpose" is to "deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Every attorney who appears in federal court "has a duty to conduct a 'reasonable inquiry into the facts and law of a case at the time [at] which she affixes her signature on any papers to the court.'" *SEC v. Faulkner*, No. 3:16-CV-1735, 2018 WL 3708426, at *2 (N.D. Tex. Aug. 3, 2018) (quoting *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001)). "An attorney's conduct is judged under . . . an objective, not a subjective, standard of reasonableness." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th Cir. 2016) (citing *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 802 (5th Cir. 2003) (en banc)). This means "an attorney's subjective good faith is not enough to immunize him from sanctions based on a Rule 11 violation." *Dodson v. Nichols*, 2024 WL 4299023, at *4 (M.D. La. Sept. 26, 2024) (citing *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988) (en banc)).

"In determining whether an attorney has made a reasonable inquiry, the court may consider: 'the time available to the attorney to prepare the document; the plausibility of the legal view contained in the document; the pro se status of the litigant; and the complexity of the legal and factual issues raised.'" *Faulkner*, 2018 WL 3708426, at *2 (quoting *Thomas*, 836

F.2d at 875–76 (en banc)). Rule 11 sanctions "may not be imposed 'merely for the eventual failure of a claim; rather, sanctions are to be applied only where, *at the time of the filing*, the position advocated is unwarranted.'" *Id.* (quoting *Matta v. May*, 118 F.3d 410, 415 (5th Cir. 1997) (emphasis in original)). The Fifth Circuit described this requirement as a "'snapshot' rule." *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 570 (5th Cir. 2006) (citing *Thomas*, 836 F.2d at 875); *see also id.* ("*Thomas*'s 'snapshot' rule ensures that Rule 11 liability is assessed only for a violation existing at the moment of filing. . . . Prior to [*Thomas*], attorneys in this Circuit had a continuing obligation to review and reevaluate their positions as the litigation developed; a document that initially satisfied Rule 11 might later become the basis for sanctions if new facts were discovered or circumstances changed such that there was no longer a good faith basis for the earlier filing.").

The four subparts of Rule 11 provide independent bases for sanctions. *See F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 577 (5th Cir. 2008) ("Rule 11 requires that a party certify four specific representations . . . . A violation of any one of these can merit sanctions." (citation modified)). And an "attorney who files court papers with no basis in fact needs no more notice of her Rule 11 violation than the existence of Rule 11 itself." *Faulkner*, 2018 WL 3708426, at *2 (quoting *Merriman v. Sec. Ins. Co. of Hartford*, 100 F.3d 1187, 1191 (5th Cir. 1996)). "When Rule 11 has been violated, the court must 'carefully choose sanctions that foster the appropriate purpose of the rule, depending upon the parties, the violation, and the nature of the case.'" *Id.* (quoting *Thomas*, 836 F.2d at 877).

Rule 11 is not the only rule or statute that empowers federal courts to impose sanctions. For example, 28 U.S.C. Section 1927 authorizes awards of attorneys' fees.[6]

---

[6] "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Rule 37 also "provides generally for sanctions against parties or persons unjustifiably resisting discovery." FED. R. CIV. P. 37 Advisory Committee's Note to 1970 Amendment. Most relevant here is the authority "inherent in all courts" to sanction the attorneys who appear before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874)). This inherent power includes not only lesser sanctions, such as "control[ling] admission" to the court's bar, but also "outright dismissal of a lawsuit" and "assess[ing] attorney's fees against counsel." *Id.* at 43, 45 (citations omitted); *see also NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 703 (5th Cir. 1990), *aff'd sub nom.*, *Chambers*, 501 U.S. 32 (noting that the Supreme Court has affirmed "the inherent power of a district court to enter an involuntary order to dismiss" cases sua sponte (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630 (1962))). The exercise of this "inherent power of lower federal courts can be limited by statute or rule," such as Rules 11 and 37, but courts may invoke their inherent power to impose sanctions "even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 47, 49.

ANALYSIS

The Court discerns that two independent sanctions are necessary: (1) attorney's fees under Rule 11(c)(2), and (2) dismissal of this case under the Court's inherent power to sanction attorneys. The Court will address Mr. Biggs's Rule 11 violations before turning to its inherent power to sanction his other, arguably more egregious behavior.

**I. Rule 11 Sanctions**

Under Rule 11, "attorneys have a responsibility to conduct a reasonable inquiry into the facts and law of a case when they affix their signature on any papers filed with the court." *SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 215CV247, 2018 WL 6788033, at *4 (E.D. Tex. Dec. 26, 2018). "By signing and filing those papers with the Court, attorneys certify

that, to the best of their knowledge, the allegations and factual contentions submitted to the Court have evidentiary support." *Id.* (citing FED. R. CIV. P. 11(b)(3) (citation modified)). "Rule 11 is designed to 'reduce the reluctance of courts to impose sanctions by emphasizing the responsibilities of attorneys and reinforcing those obligations through the imposition of sanctions.'" *Id.* (quoting *Thomas*, 836 F.2d at 870).

Rule 11 sanctions are warranted when an attorney, his law firm, or his client makes factual allegations without sufficient evidentiary support. "In assessing whether a represented party and counsel made a reasonable factual inquiry into the basis of a filing," courts consider:

> (1) the time available to counsel for investigation; (2) the extent to which counsel relied on his client for the factual support of the allegations; (3) the feasibility of prefiling investigation; (4) the complexity of the factual and legal issues; and (5) the extent to which the development of factual circumstances underlying the claim required discovery.

*SyncPoint Imaging*, 2018 WL 6788033, at *5 (citing *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444 (5th Cir. 1992)); *see also Skidmore Energy, Inc. v. KPMG*, No. 3:03-CV-2138, 2005 WL 8158140, at *6 (N.D. Tex. Mar. 18, 2005) (reciting the same factors and adding a sixth, "whether the attorney accepted the case from another attorney"). "The reasonableness of the legal inquiry is determined by considering the time available to the attorney, the plausibility of the legal view contained in the document, the *pro se* status of the litigant, and the complexity of the legal and factual issues." *Skidmore*, 2005 WL 8158140, at *6 (citing *Our Lady of the Lake Hosp.*, 960 F.2d at 444).

Here, the Zallar Affidavit submitted to the Court on April 20, 2023, violates Rule 11(b)(3). That provision of Rule 11 requires that all "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3).

14

Ms. Zallar's Affidavit presents itself to the Court as an authoritative account of the events it describes, using no prefatory language such as "on information and belief." And it repeats *ad nauseam* that "Defendants"—referring to both AKOS and GHG—took certain actions.[7] *See* ECF No. 20-1 at 3, 4, 5, 6. But at every turn, "Defendants" meant only AKOS—even though the relationship between GHG and AKOS is the *sine qua non* of this case. Yet Mr. Biggs treated the two defendants as a single entity by submitting the Zallar Affidavit, causing the Court to believe GHG and AKOS were closer than they were.

Paragraph 19 of Ms. Zallar's Affidavit also lacks evidentiary support. While GHG initially disputed *any* meeting took place on August 4, 2022, they conceded in their Reply and during the hearing that such a meeting "probably" did occur. *See* ECF No. 196 at 5 ("GHG agrees that a meeting took place on August 4, 2022, along with another meeting on September 2, 2022."); ECF No. 206 at 17 ("To settle the Court's mind, in our reply brief, we acknowledged there probably was one. We should certainly be forgiven our uncertainty on the matter in part because Mary Jo Zallar testifies in her deposition that there was no such meeting."). Regardless of the initial uncertainty about whether a meeting occurred on August 4, 2022, the Affidavit's assertions about the *contents* of that meeting are most relevant here.

Ms. Zallar's Affidavit swore that at that meeting, GHG "made it unequivocally clear" that AKOS was GHG's "subsidiary" and was "acting as GHG's agent." ECF No. 20-1 at 5. But as her deposition later revealed, that was not true. *See* ECF No. 176-4 at 7 (counsel for GHG: "That never happened, did it?" Zallar: "No."). Plaintiffs have repeatedly presented this portion of Ms. Zallar's testimony to the Court as evidence that *GHG*, not just AKOS, believed that AKOS was their agent and subsidiary.

---

[7] The Court also addresses this misleading conflation of AKOS and GHG at greater length later in this Order. *See infra* Part II.B.

The Court **FINDS** that these violations of Rule 11(b)(3) are the fault of Mr. Biggs rather than his clients. Indeed, all five *SyncPoint Imaging* factors—and the sixth factor from Judge Boyle's district court opinion in *Skidmore*—cut against Mr. Biggs. By signing Ms. Zallar's Affidavit, he certified that he had performed an "inquiry reasonable under the circumstances" into its underlying facts and determined that those facts had "evidentiary support." FED. R. CIV. P. 11(b). He performed no such investigation beyond speaking with his clients and transcribing their conversation, which he then submitted to the Court as a sworn affidavit:

> It was all based on her own words. I'm typing it up as she's telling me over the phone and then, you know, rewording it in a more legal—you know, a more— a format more appropriate for an affidavit than a telephone conversation. It's not that I'm trying to write her own affidavit. And clearly, this isn't a fill-in-the-blank affidavit. This is very customized to this case.

ECF No. 206 at 100.

Because Mr. Biggs violated Rule 11(b)(3) by filing Ms. Zallar's Affidavit without performing a reasonable prefiling investigation into its allegations, the Court now considers the appropriate sanction.[8] Rule 11(c)(4) provides that sanctions "imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(4). Rule 11(c)(2) specifically notes, however, that courts "may award to the prevailing party" in a Rule 11 motion "the reasonable expenses, including attorney's fees, incurred *for the motion*." (emphasis added).

The Court finds that an appropriate Rule 11 sanction in these circumstances is awarding GHG all reasonable expenses, including attorney's fees, associated with this Motion. The amount of these fees will be determined by separate order.

---

[8] GHG's Motion did not state whether GHG complied with Rule 11(c)(2)'s procedural requirements, particularly its "safe harbor" provision. However, GHG confirmed compliance by separate briefing. *See* ECF No. 210 (ordering GHG to submit a supplemental brief); ECF No. 211 (certifying that GHG served the proposed Motion on Plaintiffs twenty-one days before filing).

This Memorandum Opinion and Order applies to both Mr. Biggs and his law firm, Mullin Hoard & Brown, LLP ("Mullin Hoard"). *See* FED. R. CIV. P. 11(c)(1) ("Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."). If Mullin Hoard believes this case presents "exceptional circumstances" such that only Mr. Biggs should be sanctioned under Rule 11, the firm may file a Brief explaining those circumstances **within two weeks of the date of this Order**.

If Mullin Hoard does *not* believe this case presents the kind of "exceptional circumstances" contemplated by Rule 11(c), it must file a Notice to that effect by the same date. The Court will consider Mullin Hoard's filing when deciding how to apportion the attorney's fees award.

### II. The Court's Inherent Sanction Power

Rule 11(c)(4) limits Rule 11 sanctions to

> what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

FED. R. CIV. P. 11(c)(4).

Because this language limits sanctions to monetary penalties and nonmonetary directives to parties and counsel, the Court cannot dismiss this case under Rule 11. But federal courts also possess the *inherent* power to sanction the attorneys who appear before them. This inherent power exists apart from any statute or rule of court authorizing courts to impose specific types of sanctions. It "can be *limited* by statute or rule," such as Rule 11, but courts may invoke this inherent power "even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 47, 49 (emphasis added).

17

Thus, courts may invoke both statutorily authorized sanction powers and their inherent powers to sanction the same misconduct. Here, although Rule 11 provides for one type of sanction against Mr. Biggs, it does not prevent the Court from exercising its inherent power to impose other sanctions.

The Court hereby invokes its inherent powers to dismiss this case. The Court recognizes that dismissal is strong medicine. Even so, dismissal is well within the Court's prerogative. *See, e.g.*, *Sarco Creek Ranch v. Greeson*, 167 F. Supp. 3d 835, 845 (S.D. Tex. 2016) (Costa, J.) ("Under its inherent power to sanction, the Court may dismiss a case (when the plaintiff has engaged in sanctionable conduct) or impose default judgment (when the defendant has engaged in sanctionable conduct) when necessary to deter 'bad faith or willful abuse of the judicial process.'" (quoting *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995))). Dismissal "requires a finding of bad faith" on the part of the sanctioned party, and arguably also a "clear and convincing evidence burden of proof." *Id.* (citing *Chambers*, 501 U.S. at 50); *see also id.* at 845–46 (contrasting a Fifth Circuit opinion suggesting that clear and convincing evidence is not always required with another opinion in which the Fifth Circuit reviewed a bankruptcy court's dismissal for clear and convincing evidence). And while courts should be "especially reluctant to impose the extreme sanction of dismissal on a blameless party based on counsel's misconduct," this concern "is not present when the party directly engaged in the alleged misconduct as is the case with perjury." *Id.* at 846; *see also Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 80 (5th Cir. 2011) (upholding dismissal where plaintiff committed perjury, "a serious offense that constitutes a severe affront to the courts and thwarts the administration of justice").

Mr. Biggs's misconduct during this litigation far exceeds a simple Rule 11 violation. Thus, dismissal of Plaintiffs' Amended Complaint is warranted.

## A. Perjured Affidavit and Discovery Abuses

The Court **FINDS** that Ms. Zallar likely perjured herself when she testified that GHG "unequivocally" and "immediately" represented to Plaintiffs that AKOS was a GHG subsidiary. But Plaintiffs' counsel not only failed to verify key facts with Ms. Zallar. He also drafted the Affidavit and repeatedly urged the Court to credit the facts stated therein in denying GHG's Motion to Dismiss. He performed no discernible prefiling investigation to ensure the accuracy of the Zallar Affidavit and declined to retract the false assertions after learning they were not true.

It was only when Ms. Zallar was deposed by GHG that the truth came to light: GHG never told Plaintiffs that AKOS was their subsidiary or that AKOS or Mary Black was GHG's agent. To this day, including at the hearing the Court held on GHG's Motion, Mr. Biggs obstinately persists in claiming that "[t]here is nothing in Ms. Zallar's affidavit that is false." ECF No. 206 at 26; *see also id.* at 29 (asserting that "[e]verything in [Zallar's] affidavit is verified by other witness testimony and other documentary evidence" without directing the Court to any supposed evidence); *id.* at 27 ("What ultimately she landed on was all correct.").

Neither party disputes that Mr. Biggs *drafted Ms. Zallar's Affidavit for her*. He is not only lead counsel for Plaintiffs, but *sole* counsel for Plaintiffs. He prepared and submitted an Affidavit that later testimony revealed to be false. Either he knew the allegations were false or failed to verify their veracity. To date, he has not retracted or modified any of Plaintiffs' claims since filing the Affidavit in April 2023—even repeating many of its falsehoods in later briefing. And he is intransigent when pressed on the Zallar Affidavit's obvious distortions— even at the hearing on GHG's Motion for Sanctions.

Mr. Biggs's only defense of Ms. Zallar's about-face is that her unfavorable admissions came at the end of a "full-day deposition." ECF No. 206 at 22–23. At the hearing, Mr. Biggs candidly admitted he had "never seen a witness crash as hard as Ms. Zallar did" and that

19

counsel for GHG "took apart my witness better than I've ever seen any attorney in Amarillo take apart one of my witnesses before." *Id.* at 23.

But as GHG noted at the December 6 hearing, "Plaintiffs designated Ms. Zallar as a potential expert for purposes of this case. She can surely be held at minimum to the words she said in her affidavit, regardless of whatever sympathy we might have for a deponent after a long day." *Id.* at 41 (citation modified). The Court agrees: A key witness who signs a sworn affidavit in opposition to a Motion to Dismiss must be held to the statements in that affidavit. Ms. Zallar was also the primary point of contact between Plaintiffs and GHG and AKOS, and thus best positioned to testify about Plaintiffs' communications with each defendant. She cannot escape accountability simply because deposition testimony that undermines Plaintiffs' case surfaced at the end of a long day.

### B. Deposition Dodge

In a separate incident following Ms. Zallar's deposition, another witness for Plaintiffs endeavored to dodge a GHG deposition. The record before the Court reflects that Mr. Biggs was complicit in the witness's deposition dodge.

At the hearing on December 6, 2025, the Court asked the parties to explain why the Magistrate Judge took the unusual step of supervising the deposition of Dr. David Tyson, President of Plaintiff AFP. *See* ECF No. 155 at 11; ECF No. 206 at 114 ("In my 22 years of experience as a lawyer, an AUSA, and now a judge, I don't know that I've seen a magistrate judge present at a deposition. So how did we get to that point?"). Defense counsel said GHG asked "Dr. Tyson [to] present himself for a deposition over a number of weeks, if not a couple of months," but "the date kept changing on which he could be present." ECF No. 206 at 114. The parties finally "agreed on a date" and "noticed the deposition." *Id.* Then, "[t]he evening before" the deposition, Mr. Biggs emailed defense counsel to say "that Dr. Tyson was out of town and that he couldn't appear" at his deposition the next morning. *Id.* at 114–115. Counsel

for GHG "went to the deposition location anyway the next morning and took a certificate of nonappearance." *Id.* at 115. Mr. Biggs responded by

> fil[ing] a Motion for Protective Order to prevent the deposition that had essentially taken place in the form of a nonappearance. [GHG] then filed a Motion to Compel that deposition and that is what resulted in Judge Reno's order telling us to be at her chambers on a particular date for the deposition.

*Id.*; *see also* ECF No. 138 (moving to quash Dr. Tyson's deposition after he had already failed to appear).

Tellingly, the day Dr. Tyson's deposition was scheduled was "the discovery deadline under the existing scheduling order," and Magistrate Judge Reno is "very, very explicit on the prohibition of conducting discovery past the discovery cutoff." ECF No. 206 at 116. According to GHG's counsel, this incident "took place against a backdrop that had involved numerous missed deadlines by the Plaintiffs in this case," including "failure to timely designate an expert, failure to disclose the expert's opinions, [and] missed disclosure deadlines." *Id.*

Mr. Biggs noted that Dr. Tyson was one of "16 or 17 individuals," almost all of whom are practicing physicians like Dr. Tyson, that GHG wanted to depose. *Id.* at 117. Most of those depositions were canceled and "there was a dispute about whether Dr. Tyson was the right person to be deposed" in the first place. *Id.* But in fact, Mr. Biggs *admitted* that Dr. Tyson was not "unavailable" for his own deposition. He was simply "out of town"—which, the Court noted, is "not the same thing under the rules" as being "unavailable." *Id.* at 117–18; *see also* ECF No. 138 at 2 (noting that Dr. Tyson's deposition had been "unable to be scheduled" previously because Dr. Tyson "took an extended vacation during June 2025"). And why did Mr. Biggs wait until the evening before deposition, on the final day of discovery, to notify opposing counsel of Dr. Tyson's nonappearance? In his own words, Mr. Biggs conceded to the Court: "Dr. Tyson really didn't want to be deposed." ECF No. 206 at 119.

Clear and convincing evidence establishes that Mr. Biggs submitted a likely perjured affidavit to the Court and, at a minimum, behaved questionably when another key witness wanted to avoid deposition. In both situations, he dodged court orders for as long as possible. Even then, his compliance was involuntary. He has followed court orders only because he was forced to do so—in the case of the Affidavit by confronting Ms. Zallar's deposition testimony, and in the case of Dr. Tyson's deposition, by being ordered to appear for a deposition supervised by a federal magistrate judge.

This is precisely the kind of "bad faith or willful abuse of the judicial process" that courts should exercise their inherent sanction power to deter. *Sarco Creek*, 167 F. Supp. 3d at 845 (case citations omitted).

### C. Conflation of GHG and AKOS

From the outset of this litigation, Mr. Biggs consistently misled the Court about the relationship between GHG and AKOS. At the hearing on December 6, 2025, Mr. Biggs repeatedly used the terms "GHG" or "Defendants" when referring to AKOS *alone*. This is consistent with a pattern that appears across three years of Plaintiffs' briefing. *See, e.g.*, ECF No. 182 at 2 ("AFP executed a contract with AKOS/GHG . . . ."); *id.* at 3 (noting that an employee of Plaintiffs "testified that they had an agreement with AKOS/GHG"); ECF No. 165 at 16 (referring to "the AKOS/GHG ACO").

Perhaps the most egregious example: Plaintiffs' reliance on a "redlined" draft contract between Plaintiffs and AKOS. At the hearing, Mr. Biggs agreed that a party's redlining of a contract, without more, generally does not bind the party to that contract. *See* ECF No. 206 at 61–62. Instead, Mr. Biggs averred that the "redlines" mattered because GHG *employees* held the pen:

> **Mr. Biggs**: Your Honor, the reason I bring up the redlines isn't because of the content of the redlines. The content of the redlines is somewhat irrelevant. It's who is redlining it.

If Mr. Biggs and Mr. Stone are entering into a contract and Mr. Stone redlines it and marks it all up and I look at it and do my redlines, we don't have a contract yet, I agree. That's basic hornbook law. But if Mr. Biggs and Mr. Stone are entering into a contract trying to buy a widget or sell a widget and all of a sudden Judge Kacsmaryk starts redlining the contract and there's no existing relationship between Mr. Stone and Judge Kacsmaryk, I would be a little bit confused. That would be like hey, where did Judge Kacsmaryk suddenly appear in this deal?

**The Court**: Who's doing the redlining?

**Mr. Biggs**: Counsel for GHG said that Mary Black was redlining the contracts. That's totally false. GHG employees are redlining the contract, and Mary Black specifically says hold up. We need to wait for GHG to finish redlining the contract.

*Id.* at 62–64 (citation modified for readability).[9]

But GHG never redlined anything. Mr. Biggs referred the Court to the following documents, which show the following Microsoft Word "track changes" edits by users named "MB1" and "MB2":



ECF No. 20-1 at 54, 63–64.

---

[9] Mary Black was formerly Regional Vice President for AKOS. *See* ECF No. 165-1 at 11–12.

That's all. A few suggested revisions to a draft contract between Plaintiffs and AKOS, made by a person who appears to be Mary Black. But Mary Black is a former employee of *AKOS*—not GHG. Yet Plaintiffs think Mary Black's AKOS redlines prove the existence of a "contract" with Defendant GHG. (That is, the "contract" Plaintiffs cannot produce in written or electronic form, notwithstanding their day-to-day practice in a healthcare sector replete with paperwork requirements—specifically, a Medicare practice with document-intensive CMS compliance rules and regulations.) Even if Mary Black misstated or misrepresented herself as a "bridge" between Plaintiffs and GHG, the redlines are only evidence of her misrepresentation—not a "contract" with GHG. And it certainly is not evidence of any direct communication between GHG and Plaintiffs.

At this point in the hearing, the Court was incredulous. A consistent pattern across Plaintiffs' briefing presents AKOS and GHG as a "conjoined twin of Defendants" that, "on first read[,] might suggest that there is some sort of correspondence or contract between GHG and Plaintiffs." ECF No. 206 at 47. "But in fact," the Court continued, "if you disaggregate the documentary evidence, it's always just Mary Black." *Id.* (citation modified).

Next, the Court asked if Plaintiffs' entire case rested on an informal logical fallacy: *petitio principii* or "begging the question."[10] In other words, Plaintiffs' core thesis assumes the truth of the thing to be proved: they entered into a "contract" with GHG because GHG and AKOS (in truth, just Mary Black) are one and the same. Time and again, Plaintiffs elide and evade their burden of proof by merely *assuming* it's true that GHG and AKOS are *interchangeable* entities for purposes of this lawsuit. But GHG clearly and loudly disagrees. And Plaintiffs offered scant evidence showing *any* connection between the two, much less a

---

[10] "What is the Latin for begging the question? I think it's *petitio principii*; is that right?" ECF No. 206 at 44–45 (citation modified).

sufficiently close connection to prove any of their claims. Instead, all the alleged "connections" are rooted in Mr. Biggs's intentional or reckless conflation of the two defendants.

This sleight of hand recurs throughout Plaintiffs' briefing. Start with their Amended Complaint. It refers repeatedly to AKOS and GHG as "Defendants"—for example, when saying that "Defendants wrote Plaintiffs" on July 29, 2022. ECF No. 22 at 4. But that email came only from AKOS, not GHG, and GHG was not even copied on it. The Amended Complaint also refers to "Defendants' employee Mary Black" when, as we have seen, Ms. Black worked only for AKOS. *Id.* Plaintiffs repeated this as recently as their Response to the instant Motion, where they write that "AFP executed a contract with AKOS/GHG at some time before September 6, 2022." ECF No. 182 at 2; *see also* ECF No. 165 at 4 (on September 16, 2025, writing "Defendants' employee Mary Black" and "Defendants wrote back immediately," referring to an email sent by Mary Black).

Whether Plaintiffs have confused the identities of AKOS and GHG intentionally or merely carelessly, they have done so for years, starting with their Amended Complaint and continuing until today. The Court is inclined to view this conflation as intentional, because it gets right to the heart of this case: What did GHG tell Plaintiffs about their relationship with AKOS? The truth, as it turns out, is *nothing*.

Because Mr. Biggs both presented a false affidavit to the Court without verifying its key claims and consistently misled the Court about the relationship between AKOS and GHG, the Court **FINDS** that dismissal of Plaintiffs' Amended Complaint is "the only effective, appropriate sanction to remedy this misconduct and to deter future similar misconduct." *Brown*, 664 F.3d at 80. The Court further finds that Mr. Biggs's insistence on maintaining his "patently unreasonable litigation position[]" constitutes a bad-faith abuse of the litigation process. *Sarco Creek Ranch*, 167 F. Supp. 3d at 845 (citing *Brown*, 664 F.3d at 76–80). In addition to dismissing this case, the Court **REPRIMANDS** Mr. Biggs.

CONCLUSION

The Court **GRANTS** GHG's Motion and **AWARDS** GHG all reasonable expenses incurred in litigating its Motion, including attorney's fees. The amount of those expenses will be determined by separate order. Mullin Hoard & Brown, LLP is further **ORDERED** to file either a Brief or Notice, as described above, **within two weeks of the date of this Order**.

This case is **DISMISSED** with prejudice. This Memorandum Opinion and Order shall serve as a **REPRIMAND** to Richard Biggs.

**SO ORDERED**.

February 3, 2026.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE